Today we have just two cases, and Justice Hall will not be here, but she will participate in the decision-making process, and she will listen to the tape. Would the lawyers please approach the bench and introduce yourselves? Good morning, Your Honor. My name is Daniel Konacek, and I represent the defendant appellant in this case. Good morning, Your Honor. My name is Nathan Neff. I'm representing the appellees. Okay. All right. The appellant, how much time are you going to reserve for rebuttal? Your Honor, I don't even see it. Do we have 10 minutes? Well, you know, you have 15 minutes in total. Okay. All right. Well, let's proceed. May it please the Court? Again, my name is Daniel Konacek, and I represent the defendant, Mr. Greenfield. The case has some familiarity to the Court. It went up on the declaratory judgment action on the issue related to whether or not there should be insurance coverage or not. And the opinion there set forth the facts in this case. But just by way of brief background, Mr. Greenfield had prepared estate planning documents for his clients over the years for Leonard and Muriel. And what's become an issue now in the subject of the malpractice case that has been brought by the beneficiaries, certain beneficiaries and not all of the beneficiaries, is the last estate plan that he did for Muriel in 2008, where it left out the clause for the power of appointment. And that's really become the issue. The briefs that we have presented to the Court discuss some of the arguments going back and forth as to why or why not there should be damages and why summary judgment should or should not be granted. But that's not what's at issue. What became at issue was during the course of Mr. Greenfield's deposition, we asserted attorney-client privilege as it related to communications between Muriel, Leonard, the clients, and J.P. Morgan, the bank that was handling or assisting in the handling of this estate. We contended that the attorney-client privilege under 1.6 was applicable not only to the communications that Mr. Greenfield had with Leonard and Muriel, but also that were made with the agent who was assisting in the estate plan, the J.P. Morgan people. After we objected, as you can tell, there were a number of orders that were entered by Judge Duncan Bryce, where she was trying to work around our objection. She overruled our objection at one point as it related to all of the 1.6 privilege that we claimed. Then on July 28th, she agreed with our objection, or at least in her order, she reversed herself as it related to the direct communications with the clients, Leonard and Muriel, and overruled our objection as it related to J.P. Morgan, and that's why we're here. And I think that the issue then is, as far as I can see, based on the court's order and what Judge Maris finally said, I am going to allow the contempt. You know, we asked for a friendly contempt to finally get the issue resolved. We had asked Judge Duncan Bryce on a number of occasions, and she tried to work around it, but Judge Maris finally did on March 2nd issue the order in fining us $100 in order that we could appeal. And as far as I see then, the only issue is, is there some reason, compelling reason, why the communications between Mr. Greenfield and J.P. Morgan that involved the client should somehow fall outside the protection of Rule 1.6? And the briefs are lengthy, but, you know, what's missing is there's no case that says, that stands for the proposition that the communications by the lawyer and an agent, in this instance the J.P. Morgan bank and the individuals who work for the bank, should fall outside the Rule 1.6 ambit. There's nothing. Does it matter when these communications took place? It does. And what? It would have to be before death. Okay. So it's our position that all the communications prior to the death of Muriel would be protected if, Justice, if they obviously involved communications involving the attorney-client issues relating to the trusts and the estate plan, which in the 17 documents that we've withheld, and you have our privilege log, they do involve the communications regarding the estate plan. So the timing is important, and we've withheld those documents relating to communications before her death. We did note, and I think it was in our reply, mistakenly there were a couple of documents that were after the death, the banking documents that we think should be produced, but they've already been produced by J.P. Morgan, and I don't think that's an issue, and we're not disputing that. Let me ask you two questions in two different areas. Yes, sir. You tell us now that this is a friendly contempt. Yes, sir. Did you mention that anywhere in your brief, that this is a friendly contempt? No, I don't. If I looked at that brief, I don't think you did. The words friendly wouldn't appear. No, but, you know, in looking at it, I agree with you. It's a friendly contempt. I hope so. But I didn't see it anywhere in the brief. The second point, you know, the second question I want to ask you is this. Mr. Greenfield, you know, made a disclosure to his clients, and he told them that he made a mistake. Basically, what he has done is he has admitted to deviating from the standard of care. Yes. Okay, this is what he's done. Now, in doing that, does that have any effect on the attorney-client privilege? It's one of the questions I anticipated, because it's a question I asked myself when we were going through the briefing, Justice. And I had a response, and it was twofold. So I have a prepared response. In the letter that he wrote to the beneficiaries where he said there was a scrivener's error, it's always been my position that the beneficiaries of the estate are not the actual clients. They're third-party beneficiaries under the Oval v. Wheaton and the Pelham v. Greysheimer holdings. So the Supreme Court in those cases was very clear to say that the client still remains as the people who had the estate plan. The beneficiaries, by virtue of their status as beneficiaries, had a third-party status. So in viewing it in that context, I don't think that that letter has any effect on the assertion of the attorney-client privilege, nor do I believe it would waive the attorney-client privilege by writing that letter, Justice. Okay. And would we have two categories here, communications prior to Muriel's death and those after Muriel's death? Yes, absolutely. I don't think those that are after death would be covered anymore because then it would be the estate. And I think in that circumstance, if Mr. Greenfield is representing the estate, then it's the estate's privilege. And in this instance, you do have Ms. Adler, who is a co-trustee, and I think she has the ability to waive the privilege as it relates to communications with the estate. But as in the Hitt case, which discussed this exact issue in 1997, the Fourth District, they said those that were involved with the client before the death obviously remained privileged and it wasn't the trustees or the executors privileged to waive. So your argument is that Ms. Adler steps into the decedent's shoes and then can exercise whether or not she wants to waive the privilege or not? Under Hitt, she can't. The court addressed that and said you can't step into the shoes and waive. For communications that occurred pre-death, but anything that occurred after death regarding the estate between Mr. Greenfield and the trustee or executor, I believe she could waive. So that's the cutoff. Well, is Greenfield the holder of the attorney-client privilege? Yes. For this purpose, Justice, is that when we as lawyers have the confidential communication, we do have to hold it. And I think some lawyers have ended up in jail protecting it. It's the client's to waive, but the attorney has to maintain the privilege at all costs. And we can all think of examples. Well, you're familiar with In Re Marriage of Decker? Yes. And also Center Partners? Yes. And you're still telling me that the attorney is the holder of the attorney-client privilege? I'm not going to say holder. I'm going to say he has to protect it. It's not his or hers to waive. Well, you know, he's either the holder of the attorney-client privilege or he's not. You know, there's no in-betweens. How do you come up with this? Because if it's the client's to waive and we've got the cases that say even after death the privilege must be protected, that's where we go. But who gives the burden on the attorney to protect it? And here, you know, even if there was such a law, which I don't think there is, I'm going to tell you right off the bat, but even if there was such a law, when somebody makes a disclosure like he made, you know, you want us to say as a matter of law that that has no effect on anything? That's what we're asking. Yes. I don't think it does. You think if there was such a law, that would be a reasonable law? I mean, if we would hold such a thing, would that be a reasonable holding? I think in order to protect the privilege, yes. And it's a balancing. It's a balancing. At what point do we say it is or isn't protected? And at what point is the attorney in the position that he or she can waive or not waive? Well, in In Re Marriage of Decker, the Illinois Supreme Court seemed to think otherwise. In that case, that arose out of a litigation context, whereas here it doesn't. I mean, here it's in an estate planning context. Well, I understand that. But the question is the Supreme Court didn't make differentiations like you're making. Yeah, because I don't think they were presented with a similar fact pattern. Okay. All right. Proceed. I have a question in regards to, again, Ms. Adler. All right. You indicated that post-death the privilege can be waived and that Ms. Adler can waive the privilege, right? Yes. But in the case that's before us now, right, the estate's not a party. So how can the privilege be waived? That's right. That's exactly. In this instance, the estate is not a party. Okay. It's only strangers to the attorney-client relationship who have third-party beneficiary status. Okay. So did you raise that at the trial level? It wasn't brought up, but that's a point that's well taken. I mean, that inures to our benefit. It's not the estate that's bringing this. It's third-party beneficiaries, beneficiaries of the estate. So that question is then, could they, as third-party beneficiaries, that status alone waive the privilege for communications after death? And I don't think so. I think it's the estate in that instance that would have the right. I'm reserving. Okay. Good morning, Your Honors. Good morning to the court. My name is Nathan Neff. I'm representing the appellees. There was just a very interesting concession right now. For the first time, we're hearing that Mr. Greenfield is willing to discuss his communications with J.P. Morgan personnel after the death of Mrs. Perry. We spent a dozen pages in our appellee's brief discussing the type of questions that we wanted to find out, because the exact thing that happened here was that J.P. Morgan had a communication with Mr. Greenfield to advise him that they could not execute on the detailed estate plan that Muriel Perry had put in place. He was called upon to provide an explanation. He has a series of communications with J.P. Morgan as to why it is that they're not able to do their job under the trust agreement. And it culminates with the June 17, 2008, letter to the beneficiaries. And note that June 17, 2008, letter under the DeLuga holding was supposed to be truthful. It was supposed to give an accurate explanation as to why it is my clients are not going to receive $863,900 that Muriel Perry wanted them to have. Well, he sees the light now. Well, for the first time at oral argument. There's no concession. You as a lawyer may be in the same position. You know, you work on a case and then all of a sudden it comes to you after reading all the case law that the other guy is right. You know, that's what happens. None of us know everything. It's certainly an interesting concession. And today's date is particularly fitting because today is the five-year anniversary of the death of Muriel Perry. When she passed away, she had what she thought, I'm sure, was a detailed estate plan that called for distribution of specific amounts of money. After she passed away, J.P. Morgan was unable to execute on that detailed estate plan. They spoke with Mr. Greenfield. Greenfield was called upon in his fiduciary capacity to provide a truthful explanation as to why this happened. Well, we know the facts, you know. We've been around and around on this case, so we're quite aware of the facts. Well, he promised to cooperate fully and pay homage to the memory of Muriel Leonard Perry. We're not able to reach an amicable resolution with him prior to filing suit. So he forces the beneficiaries to initiate litigation. We initiate litigation, and the first thing he does is deny any liability, denies proximate cause, denies that Muriel Perry had the power to make appointments, denies that there's any damages, et cetera, denies that we can introduce evidence on this front. Judge Duncan Bryce rules in a comprehensive 11-page order overruling that. Well, we are, you know, we're aware of that. You know, that's not what's before us now. Well, you're aware of everything that happened in this case, but it all depends on what hat you're wearing. If you were the insurance company and your insurer made an admission of negligence, you wouldn't be a happy camper either. Your Honor, I'm not sure that Mr. Greenfield made an admission of negligence as much as he admitted as consistent with his ethical duty as to the facts as he understood them to what happened. And he went forward in his letter and he said, I did not include a power of appointment in the year 2008 will that had existed in the year 2007 will. And he said as a result of that omission, beneficiaries, and in this case my clients, aren't going to receive as much money as Muriel wanted them to have. And he promised to cooperate fully. That cooperation never materialized. We then issued Rule 216, request to admit. We got a series of objections. We had five briefs on it. Judge Duncan Bryce overruled all of their objections, deemed all of the requests to admit, admitted. Yeah, but the issue here that you should be arguing is whether the communication between Greenfield and J.P. Morgan that occurred prior to Muriel's death, you know, is that privileged or not privileged? I submit that they are not privileged. And here's why. The attorney-client privilege arises from a meeting of the minds, an agreement by the client, where the client wants to have a full and frank conversation with the attorney to get legal advice. In this situation, J.P. Morgan's duties arise by virtue of a contract, a contract with the trust itself. J.P. Morgan's duties, fiduciary in nature, are to the beneficiaries of that trust. During the lifetime of Muriel Perry, she was the sole beneficiary, and indeed, it would have a relationship with her that J.P. Morgan's comments with Muriel Perry might be privileged. After Muriel Perry passes away, the co-trustee is one of my clients in this situation. Now, what we sought was communications that Mr. Greenfield had with J.P. Morgan about Mr. Greenfield's conduct. When we first submitted that, there is no attorney-client relationship as between Mr. Greenfield and J.P. Morgan. One of the reasons we know this is the case is because J.P. Morgan has not one but two sets of other attorneys with whom it's enjoying those confidential communications. It had communications with Holland and Knight, as well as its own in-house counsel. So from the first instance, we said there is no attorney-client privilege. When Mr. Greenfield is speaking with J.P. Morgan, and this is after the death of Muriel Perry, about what happened and why they're not going to be able to effectuate the agreement, this isn't something that Muriel Perry's wishing to keep confidential, that if it were disclosed would somehow become embarrassing to her, as suggested by the rule under Rule 1.6. This is about Mr. Greenfield's conduct. And we respectfully submit that there is no attorney-client privilege, but even if there had been, it's the law of this Court that a party waives the attorney-client privilege by relying upon a legal claim or defense, the truthful resolution of which requires the examination of confidential attorney-client communications. That is the at-issue exception. What is at issue is Mr. Greenfield's conduct, what he said. He had an obligation to give a truthful explanation. He's since come into this litigation and filed a motion for summary judgment, which said all of the stuff that I told the beneficiaries, presumably true under the Deliverable Holding, wasn't true. It was legally erroneous. I have a different rationale for avoiding liability here. Well, let me interrupt you for a second and ask you the same question, though. Is the estate a party in this action? No. Well, then how can the attorney-client privilege be waived if the executor of the estate is not a party to the action? And as counsel mentioned earlier, that Adler steps into the shoes of the decedent. Sure. It first has to be invoked. And as the Court correctly pointed out, under the Decker decision, the holder of the privilege is the client. It's not the attorneys to invoke. It's the clients to invoke. And in this situation, we're now in litigation and the trustee of the estate is one of the plaintiffs who's asking for disclosure. There has never been an invocation by the client of the attorney-client privilege. That was done by Mr. Greenfield at his deposition in order to avoid answering questions as to why he drafted the documents the way he did. But, again, if the estate's not a part of this action, then how can we determine whether or not the privilege can be waived in this action? Well, the answer is twofold. Number one, the first analysis would be, was it properly invoked by the holder of the privilege? And the answer to that is no. The holder of the privilege has never invoked it. But if we went past that and said, okay, we've assumed for purposes of our argument that there's been a proper invocation of the attorney-client privilege, in our situation, we first have Judge Duncan Brice's multiple court rulings saying there is no privilege. And in that situation, under this Court's case law, it's the appellant's burden of proof and production to come forward and show why it is that this attorney-client privilege, which is to be strictly construed within its narrowest possible limits, should win the day here. Why Judge Duncan Brice should be overruled, or multiple orders should be overruled. If the Court were inclined to find that there was an attorney-client privilege, then our second argument is that it is at issue and is therefore waived. Mr. Greenfield has placed it at issue. And there's two points on this. The at-issue waiver doctrine can be applied by either the client or the attorney. And there's a case law on this that I'd be happy to discuss on that front, Waste Management, Lama v. Pressville, and the Fishel and Kahn case. For example, if an attorney sues his client, the attorney has put it at issue. In this situation, Mr. Greenfield came into litigation telling the beneficiaries one thing. He then files a motion for summary judgment which says, what I told you before isn't right. I have a different reason. And when I start to ask him about that different reason, well, why is it that you drafted a provision that would only allow money to go to people you know don't exist, lineal descendants? His attorney objects that it's immaterial. So when we go in front of Judge Duncan Brice, we have a multitude of objections. It's not just the J.P. Morgan attorney-client issue. And for that reason, the standard of review here is mixed. Because as to certain of Judge Duncan Brice's rulings, it's subject to an abuse of discretion. For example, is it truly is the issue of why he drafted the documents the way he drafted the documents in a legal malpractice action involving his drafting of documents immaterial? That would be abuse of discretion. As to the question of law, as to the application of the attorney-client privilege or an at-issue exception, that would be reviewed de novo. So we have a lot of issues here. And it starts with the January 7, 2011 order. That's the first order. And on this point, I'd like to note something to the Court. Not once did the plaintiffs seek to have disclosed communications by Leonard or Muriel Perry with Mr. Greenfield. It wasn't asked at the deposition. It wasn't advocated in a motion to compel. It was not ruled upon by Judge Duncan Brice. The first representation that was made here in the nature of the case as well as in Appellant's argument was that somehow under Rule 1.6, the plaintiffs were hard-charging trying to discover purely attorney-client communications between the Perrys and Mr. Greenfield. That's not true. He refused to comply with the January 7 order. Actually, they were going to comply. They were on their way over to my office with a box of documents. When I got at the last moment, he says, well, we're not going to do it after all. So we filed a second motion for sanctions, Rule 219, sanctions. Concurrent with that, the defendants filed a motion for reconsideration of the January 7 order. In ruling on that, Judge Duncan Brice made it clear that her orders, overruling their objections, didn't go to communications between Leonard and Muriel Perry and Mr. Greenfield. And we don't have a quarrel with that. We've never sought that. What we're seeking are communications with third parties, one of which is J.P. Morgan personnel, who had their own counsel. There was a representation that she reversed herself. No, she never did. She never reversed herself at all. There was a representation that the defendants asked for a contempt citation. That should be put in the record. They never asked for a contempt citation until after Judge Duncan Brice had retired and the issue was brought back up before Judge Marsha Maris. That's when they said and made it quite clear, we're not going to comply. And we pointed out in our, if you reviewed the report on proceedings in the oral argument before Judge Maris, we pointed out that there were about four or five orders that came before they finally said, we're not going to do it. We're not going to comply. Hold us in contempt if you have to. And Judge Marsha Maris made a finding that this was deliberate and contumacious. In fact, she made that finding twice. And so we wanted to apply the George William Hoffman analysis, which was almost an identical situation where the trial court provided a party multiple opportunities to come into compliance. That party refused time and time again. In this situation, we have four or five court orders over eight months. Now, are you telling me this is not a friendly contempt and we should hold the party in contempt here? I'm personally friendly with Mr. Konacek. He's a great guy. I just don't believe that friendly contempt has any application in a situation where you have noncompliance with four or five court orders. Now, the fact that it wasn't a criminal contempt, I suppose, would imply that there is some degree of amicability here. But this is a civil contempt. No, this is a civil contempt. But the way I always look at contempt is, you know, why hold anyone in contempt if they're trying to appeal something and obtain a ruling? Well, the jurisprudence advises that in this type of situation, the party that's withholding information holds the keys to the contempt citation. Yeah. Well, that's always in the civil – in every civil contempt case, it's the contempt lawyer who holds the keys to their cell. Correct. Okay. The last point that I was hoping to make here is Judge Maris was obligated to review the entire history of the litigation. And I'd like to, if I could, quote from the Illuminati. Well, you know, you already ran out of time, but I'll give you a couple minutes. You know, we don't hold people exactly to the minute. If you have something to tell us, we'll be glad to listen. If I could just briefly then. The Illinois Appellate Court in the case of Clymore v. Hayden said, lastly, we reject plaintiff's argument that the trial court, when hearing a motion for sanctions due to violation of court orders or rules, must somehow be limited to considering only the particular violation then before it. The way the parties manage a lawsuit constitutes a cumulative enterprise, and we will not impose blinders upon trial courts as they exercise their discretion in this important area. A trial court can and should consider past violations, explanations, court responses, and essentially the entire history of the particular litigation before it to take under Supreme Court Rule 219. It should be too obvious to state, but in view of plaintiff's argument, we will state it anyway. The same violation that here resulted appropriately in dismissal with prejudice because of plaintiff counsel's history of egregiously disregarding court orders and rules might, in a case without such a history, result in only minimal sanctions. What we endeavor to do is show that from the beginning, from the pleading phase, there has been a conscious effort to deny these beneficiaries their day in court. There's been a constant refusal to answer questions in 216s, in discovery, and the like, and then there was noncompliance with multiple court orders. And as a result, the relief that we requested was the striking of their pleadings and the entry of a default judgment. And what we've asked this court to do is, under its power, under Rule 366, was to enter the just order. It's been five years. Mr. Greenfield's told him one thing, and then he's changed his mind, and when we ask him about it, he says, I won't tell you it's privileged or it's immaterial. We respectfully submit that Mr. Greenfield's wrong on this point. Judge Duncan Brice was correct that the appellants here have not met their burden of proof or of persuasion that the privilege, which is supposed to be confined within its narrowest possible limits here, is either properly invoked or not at issue. Mr. Greenfield's placed it at issue by changing his legal positions. We need to find out why in the event this court's not inclined to grant us the relief we request under Rule 366. I thank you for your patience. I appreciate it. Thank you. All right, rebuttal. I have a couple minutes. Okay. The orders that we're appealing from don't deal with they didn't cross-appeal, in other words, saying that Judge Maris should have entered these terrible sanctions against us. And we've supplied the court the record on that argument, and it's clear that it was a friendly contempt that went on there. She had to find deliberate and contumacious in order for us to have the right to appeal that we've done. If she doesn't find it's deliberate and contumacious, we can't be here. So she followed the rules in order to get us here today because she felt it was a compelling issue. And then the other order that we're appealing from is the July 28th order of Judge Duncan Brice, which doesn't involve any of the other history in this case of the discoveries he's raised. It's not part of the record, and it's not at issue. So we're here on whether or not the communications between Mr. Greenfield and J.P. Morgan prior to the death are privileged. Justice, I want to go back to Decker, and I felt inadequate, so I went and pulled the case right off the table there in my response to you. In Decker, the trial court found that the privilege did not apply, the evidentiary privilege of attorney-client, because there was the crime-fraud exception. So the court made a finding saying, in light of the crime-fraud exception, there is no privilege. The privilege does not exist. So, Justice, when the attorney asserted the privilege, there wasn't a privilege. By virtue of the finding of the trial court, which was ultimately upheld by the Supreme Court, and the Supreme Court, in its decision, made that point, that the attorney wasn't asserting a privilege because the court found no such privilege existed by virtue of crime-fraud. Yeah, but I said, the only thing I said is that the case shows that an attorney is not the holder of the attorney-client privilege. Yeah. Yes. I mean, you could take a pencil, everybody does it, and they, you know, that's what lawyers do. You could take this pen and you call it an elephant, and you try to argue before me that this pen is an elephant, and I will listen to your arguments, okay? But I still know that it's a pen. Yeah. I don't think I can convince you otherwise. Okay. So, you know, I've been around a long time. Yep. So, I mean, on the Decker, I felt like I didn't give you an adequate explanation. Well, I, you know, I know what the explanations are. The other point on the ad issue, there's no way an attorney can put the privilege ad issue. I mean, that would flip attorney-client privilege on its head. So anytime that an attorney wants to divulge a client's information, it can say, well, I'm going to put it ad issue. That would completely annihilate the privilege, and it would annihilate any protection of the privilege. I mean, we are bound under Rule 1.6 to protect that privilege. I agree with you on this, and we're bound to follow what the Supreme Court says. So we, you know, these are the problems of life. Yes. You know, I know that lawyers die for the attorney-client privilege. I, you know, that's why lawyers are so important. I have a couple questions. Sure. With regards to this issue about the friendly contempt. Yes. Counsel just argued that actually their client has been denied access to documents and communications and that it's been an ongoing, deliberate effort to prevent them from obtaining this information. So therefore, if the court enters a contempt, it's not a friendly contempt. It's actually as a result of a contemptuous conduct on behalf of the client. I think in the transcript before Judge Maris, it'll show, and the orders that were entered, you'll see in the orders where Judge Duncan Brice would enter an order saying produce, we would say we have attorney-client privilege. At one point she, and she did. I mean, the order itself grants our motion to reconsider where she said produce everything. On March 9, 2011, she grants our motion and says, okay, we don't have to produce as to the communications directly with Muriel and Leonard. So it wasn't like that at all on the record. We'll bear that out. You know, that George case, look, we showed up to court every time. We had hours of argument. We had the case law, as Justice Gordon pointed out. We took a position that we felt was the right one. So there was nothing where we failed purposely other than to protect the privilege. That was the only reason. All right, Harry, you have already exceeded your time. I'm sorry. Okay. All right. Thank you. Well, we want to thank both of you. You gave us a very interesting case, and we will take the case under advisement.